UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
Darnel Powell Bey                                    Index No: 2:18-CV-07022(RPK)(PK)
Ex. Rel. DARNEL POWELL

RECEIVED
APR 20 2022
PRO SE OFFICE

                         Plaintiff,


            -against-                          **MOTION FOR RECONSIDERATION**


WESTBURY UNION FREE SCHOOL DISTRICT,
EUDES S. BUDHAI, Superintendent of Schools;
WESTBURY UNION FREE SCHOOL DISTRICT-
BOARD OF TRUSTEE(S)- FLOYD EWING and
PLESS DICKERSON from 2009 to 2021 excluding
STANTON BROWN and ROBIN BOLLING; and
including LISA MALDONADO, ANN ALEXANDER
and MICHAEL BURGER et. al.



                         Defendant(s),
------------------------------------------------------------------X

In response to the MEMORANDUM AND ORDER by Judge Rachel P. Kovner on 3/28/2022; I
am requesting this court accept the Motion for Reconsideration due to et. al. which includes all
defendants such as New York State Education Department- Commissioner of Education and
Westbury School District-Superintendent of Schools and Board of Trustee members. Therefore,
an incorrect application of law was applied. To be specific, defendant's motion to dismiss due to
statute of limitation is unlawful (8 U.S.C. 1229a(C)(6); 8 C.F.R. 1003.2(b)(1); Ayala v. Sessions,
855 F.3d 1012, 1020 (9th Cir. 2017; Ma v. Ashcroft, 361 F. 3d 553, 558 (9th Cir. 2004).

Furthermore, New York State Education Department is the governing agency of New York State
School Districts. With that said, filing a claim against New York State Education Department is
coupled with filing a claim against Westbury School District. SED is the parent and Westbury
School District is the infant/minority. Further, et.al. applies in this claim. Making a complaint the
SED or Westbury School District is one in the same

Dated: April 16, 2022

Respectfully Submitted,

Darnel Powell Bey
Authorized Representative for Ex. Rel DARNEL POWELL
All rights reserved – U.C.C. 1-308, A free Moor, In Full Life, In Propria Persona Sui Juris
P.O. Box 308
[Huntington Station, New York 11746]]
917-273-0919

Darnel Powell Bey
P.O. BOX 308
HUNTINGTON STATION NEW YORK 11746
(917) 273-0919
darnelcpowell@gmail.com

April 16, 2022

Honorable Judge Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: Powell- Bey v. N.Y.S. Dept. of Educ., et al, 18 Civ. 7022(RPK) (PK)

Dear Honorable Kovner:

This memorandum is in response to this court's MEMERANDUM AND ORDER prepared for dismissal. I would have sent additional correspondences prior to this ORDER; however, this court prevented Plaintiff from doing so or face sanctions as written in last document.

This court stated Plaintiff must show statutory or constitutional power to adjudicate the motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). However, Federal Rules of Civil Procedure-FRCP aren't statutes because they are not enacted by Congress (also FRCP adoption by order of the Supreme Court does not apply and cannot pass legislations). Further, they are not regulation because they are not issued by a federal administrative agency; instead (FRCP) was established by an Advisory Committee. Therefore, it is pointless to attempt to show power to adjudicate when said source does not have the power. Treaty is the measure/standard of law to resolve a dispute.

Furthermore, Article 20 of Treaty of Peace and Friendship 1836 states citizens of the United States shall have any dispute with a Moor, the Consul shall decide between the parties. Fortunately, Federal courts is the proper venue and have exclusive jurisdiction to handle this dispute; primarily due to a dispute between parties from different states. Therefore, this court has subject-matter jurisdiction to hear this dispute based on the Plaintiff (me) must be a citizens of a different U.S. states than the defendant and lawsuit's amount in controversy must be greater than $75,000. Therefore, the court's inappropriately/incorrectly applied the law as it pertains to pg. 8-I State-Law Claims; A Subject-Matter Jurisdiction; throughout the entire ORDER.

Morocco - Treaty of Peace; September 16, 1836 (see exhibit participating parties of the treaty U.S.A. and Morocco).
Article 20- If any of the citizens of the United States, or any persons under their protection, shall have any dispute with each other, the Consul shall decide between the parties; and whenever the

Consul shall require any aid, or assistance from our government, to enforce his decisions, it shall be immediately granted to him.

Moreover, section 2 of the Article 111 describes the jurisdiction of the federal courts. Jurisdiction is the power of a court to hear a case, so this section tells us what kinds of cases federal courts will hear. All cases that arise under the Constitution, the laws of the United States or its treaties (see U.S. Constitution Article 111 section 2 clause 1).

Plaintiff is a Moor and can never be an U.S. citizen due to the Dredd Scott case and the 14th Amendment was never ratified. Also, Plaintiff is a citizen of the Body Politic- Moorish National Republic Federal Government North East Amexem Territories and Dominions. Defendants are identified as U.S. citizens. Again, this federal court make decision on disputes involving various things but especially disputes between residents of states and disputes involving more than $75,000.00.

Whereas, statute of limitations does not apply due to FRCP has not been enacted by Congress. Plaintiff has filed complaint against SED-parent which in turn applied directly with infant/minority Westbury School District (see file # 2: 21 cv-01179; 2:18 cv-02638; & 2:18 cv-07022). State Education Department governs the school district therefore when claimed was filed against SED-Westbury was directly involved et. al.

Whereas, statute of limitations is not mentioned in the article of treaty; therefore, it does not apply to this dispute because treaties supersede FRCP. Statute of limitation apply solely to citizens of USA; however, it doesn't apply to this case. This court has not provided treaty case law to support their claim. As mentioned, the treaty makes no mention of statute of limitations.

However, I am submitting my motion to re-argue my complaints filed by Steven Morelli/Chauncey Henry as a per se litigant via et al (ET ALIUS. And another. The abbreviation et al. (sometimes in the plural written et als.) is often affixed to the name of the person first mentioned, where there are several plaintiffs, grantors, persons addressed, etc. See In re McGovern's Estate, 77 Mont. 182, 250 P. 812, 815; Anderson v. Haas, 160 Ga. 420, 128 S.E. 178, 179; Conery v. Webb, 12 La.Ann. 282; Lyman v. Milton, 44 Cal. 630). The other defendants including Westbury School District and Westbury School District Board Members Trustees etc.

ET AL. An abbreviation for et alii, "and others." Mitchell v. Mason, 90 Fla. 192, 105 So. 404, 405. The singular is "et alius" (q. v.). It may also mean "and another" in the singular. Babb v. Dowdy, 229 Ky. 767, 17 S.W.2d 1014, 1016; Glen Falls Indemnity Co. v. Manning, La.App., 168 So. 787, 788. , Where the words "et al." are used in a judgment against defendants, the quoted words include all defendants. Williams v. Williams, 25 Tenn.App. 290, 156 S.W.2d 363, 369.

New York State Education Department is the governing agency of New York State School Districts. With that said, filing a claim against New York State Education Department is coupled with filing a claim against Westbury School District. SED is the parent and Westbury School District is the infant/minor. Further, et.al. is applied in this claim. Making a complaint against SED or Westbury School District is one in the same. For example, Plaintiff was terminated from

Westbury School District in year 2010. In turn, SED revoked Plaintiff teaching certification in year 2012. The Westbury School District and SED work in tandem as it should.

As a pro se litigant, I should not be held to the same high standards of perfection as the Defendant's attorney (see Jenkins v. McKenith, Picking v. Pennsylvania Railroad Co. and Puckett v Cox). Also, officials (hearing officers) and judges deemed to know the law and sworn to uphold the law; they cannot claim to act in good faith and willful deprivation and cannot plead ignorance of the law (see Owens v. City of Independence and Hayer v. Mello). With that said, Gloria E. Jones Khan's affidavit verify the legitimacy of Plaintiff's claim and was used a witness' statement or evidence in this dispute.

Dated: April 16, 2022

Respectfully Submitted,

Darnel Powell Bey authorized representative Ex. Rel. DARNEL POWELL
P.O. Box 308
Huntington Station. N.Y. 11746
(917) 273-0919
darnelcpowell@gmail.com
All rights reserved – U.C.C. 1-308, A free Moor, In Full Life, In Propria Persona Sui Juris

attn: Pro se! dept

index # - 18-CIV. 7022(RPK)(PK)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 2 0 2022 ★

BROOKLYN OFFICE

EXHIBIT A

# CHAPTER X

## DISTRICT OF COLUMBIA

### SETTLEMENT OF CLAIMS AND SUITS

For the payment of claims in excess of $250, approved by the Commissioners in accordance with the provisions of the Act of February 11, 1929, as amended (45 Stat. 1160; 46 Stat. 500; 65 Stat. 131), $10,000. D. C. Code 1-902 to 1-905.

### DIVISION OF EXPENSES

The sum appropriated in this Act for the District of Columbia shall be paid out of the general fund of the District of Columbia, as defined in the District of Columbia Appropriation Act for fiscal year 1957. Ante, p. 439.

# CHAPTER XI

## LEGISLATIVE BRANCH

### HOUSE OF REPRESENTATIVES

### CONTINGENT EXPENSES OF THE HOUSE

Joint Committee on Internal Revenue Taxation: For an additional amount for the Joint Committee on Internal Revenue Taxation, $50,000.

# CHAPTER XII

### CLAIMS FOR DAMAGES, AUDITED CLAIMS, AND JUDGMENTS

For payment of claims for damages as settled and determined by departments and agencies in accord with law, audited claims certified to be due by the General Accounting Office, and judgments rendered against the United States by United States district courts and the United States Court of Claims, as set forth in Senate Document Numbered 143, Eighty-fourth Congress, $1,312,538, together with such amounts as may be necessary to pay interest (as and when specified in such judgments or in certain of the settlements of the General Accounting Office or provided by law) and such additional sums due to increases in rates of exchange as may be necessary to pay claims in foreign currency: *Provided*, That no judgment herein appropriated for shall be paid until it shall have become final and conclusive against the United States by failure of the parties to appeal or otherwise: *Provided further*, That, unless otherwise specifically required by law or by the judgment, payment of interest wherever appropriated for herein shall not continue for more than thirty days after the date of approval of this Act.

Approved July 31, 1956.

---

Public Law 856

**CHAPTER 807**

### JOINT RESOLUTION

Approving the relinquishments of the consular jurisdiction of the United States in Morocco.

August 1, 1956
[S. J. Res. 165]

Whereas the laws of the United States invest the ministers and consuls of the United States in certain countries, including Morocco, with judicial authority so far as the exercise of the same is allowed by

treaty with such countries and in accordance with usage in such countries; and

Whereas the consuls of the United States in Morocco are permitted to exercise jurisdiction over American nationals under the treaty between the United States and Morocco signed September 16, 1836, and the Act of Algeciras signed April 7, 1906; and the exercise by custom and usage the same jurisdiction over subjects of Morocco or others who may be designated as "proteges" under the Convention of Madrid signed July 3, 1880; and

8 Stat. 484.
34 Stat. 2905.

Whereas Morocco is now the only foreign country where the consuls of the United States exercise such jurisdiction; and

Whereas it is the policy of the United States to discontinue the exercise of extraterritorial jurisdiction in Morocco at such time as it becomes appropriate: Therefore be it

Relinquishment of consular jurisdiction in Morocco.

22 USC 141-183.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the relinquishment by the President, at such time as he considers this appropriate, of the consular jurisdiction of the United States in Morocco is hereby approved and sections 1693, 4083 to 4091, inclusive, 4097 to 4122, inclusive, and 4125 to 4130, inclusive, of the Revised Statutes, as amended, are repealed effective upon the date which the President determines to be appropriate for the relinquishment of such jurisdiction, except so far as may be necessary to dispose of cases then pending in the consular courts in Morocco.

Approved August 1, 1956.

Public Law 857                                    CHAPTER 808

August 1, 1956
[S. 3658]

AN ACT

To amend the Act of May 11, 1938 (52 Stat. 347), so as to authorize, by agreement, the subsurface storage of oil or gas in restricted Indian lands, tribal or allotted.

Indian lands.
Subsurface storage of oil or gas.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of May 11, 1938 (52 Stat. 347), is amended by adding at the end thereof (25 U. S. C. 396d) a new section 8 as follows:

"The Secretary of the Interior, to avoid waste or to promote the conservation of natural resources or the welfare of the Indians, is hereby authorized in his discretion to approve leases of lands that are subject to lease under section 1 of this Act or the Act of March 3, 1909 (35 Stat. 783, 25 U. S. C. 396), for the subsurface storage of oil and gas, irrespective of the lands from which initially produced, and the Secretary is hereby authorized, in order to provide for the subsurface storage of oil or gas, to approve modifications, amendments, or extensions of the oil and gas or other mining lease(s), if any, in effect as to restricted Indian lands, tribal or allotted, and may promulgate rules and regulations consistent with such leases, modifications, amendments, and extensions, relating to the storage of oil or gas thereunder. Any such leases may provide for the payment of a storage fee or rental on such stored oil or gas or, in lieu of such fee or rental, for a royalty other than that prescribed in the lease when such stored oil or gas is produced in conjunction with oil or gas not previously produced. It may be provided that any oil and gas lease under which storage of oil or gas is so authorized shall be continued in effect at least for the period of such storage use and so long thereafter as oil or gas not previously produced is produced in paying quantities."

Approved August 1, 1956.

# THE

# STATUTES AT LARGE

OF THE

# UNITED STATES OF AMERICA

FROM

DECEMBER, 1905, TO MARCH, 1907

CONCURRENT RESOLUTIONS OF THE TWO HOUSES OF CONGRESS
AND
RECENT TREATIES, CONVENTIONS, AND EXECUTIVE
PROCLAMATIONS

———

EDITED, PRINTED, AND PUBLISHED BY AUTHORITY OF CONGRESS
UNDER THE DIRECTION OF THE SECRETARY OF STATE

———

VOL. XXXIV—IN THREE PARTS

———

PART 3
Recent Treaties, Conventions, and Proclamations
INDEX

———

WASHINGTON
GOVERNMENT PRINTING OFFICE
1907

Pour la Grande-Bretagne:
[L. S.]  A. NICOLSON.
Pour l'Italie:
[L. S.]  VISCONTI VENOSTA.
[L. S.]  G. MALMUSI.

For Great Britain:
[L. S.]  A. NICOLSON
For Italy:
[L. S.]  VISCONTI VENOSTA
[L. S.]  G. MALMUSI
For Morocco:

Pour les Pays-Bas:
[L. S.]  H. TESTA.
Pour le Portugal:
[L. S.]  CONDE DE TOVAR.
[L. S.]  CONDE DE MARTENS
            FERRÃO.
Pour la Russie:
[L. S.]  CASSINI.
[L. S.]  BASILE BASHERACHT.
Pour la Suède:
[L. S.]  ROBERT SAGER.

For the Netherlands:
[L. S.]  H. TESTA
For Portugal:
[L. S.]  CONDE DE TOVAR
[L. S.]  CONDE DE MARTENS
            FERRAO
For Russia:
[L. S.]  CASSINI
[L. S.]  BASILE DE BACHERACHT
For Sweden:
[L. S.]  ROBERT SAGER

Pour copie certifiée conforme,
Le Sous-Secrétaire d'Etat,
[SEAL]        E. DE OJEDA

Preamble.

And whereas the said General Act and Additional Protocol were signed by the Plenipotentiaries of the United States of America under reservation of the following declaration:

Disclaimer of political interest by United States.

"The Government of the United States of America, having no political interest in Morocco and no desire or purpose having animated it to take part in this conference other than to secure for all peoples the widest equality of trade and privilege with Morocco and to facilitate the institution of reforms in that country tending to insure complete cordiality of intercourse without and stability of administration within for the common good, declares that, in acquiescing in the regulations and declarations of the conference, in becoming a signatory to the General Act of Algeciras and to the Additional Protocol, subject to ratification according to constitutional procedure, and in accepting the application of those regulations and declarations to American citizens and interests in Morocco, it does so without assuming obligation or responsibility for the enforcement thereof."

And whereas, in giving its advice and consent to the ratification of the said General Act and Additional Protocol the Senate of the United States resolved, "as a part of this act of ratification, that the Senate understands that the participation of the United States in the Algeciras Conference, and in the formulation and adoption of the General Act and Protocol which resulted therefrom, was with the sole purpose of preserving and increasing its commerce in Morocco, the protection as to life, liberty and property of its citizens residing or traveling therein, and of aiding by its friendly offices and efforts in removing friction and controversy which seemed to menace the peace between the powers signatory with the United States to the treaty of 1880, all of which are on terms of amity with this government; and without purpose to depart from the traditional American foreign policy which forbids participation by the United States in the settlement of political questions which are entirely European in their scope."

And whereas, the said General Act and Additional Protocol were duly ratified by the Governments of the United States of America and of the other powers aforesaid, and by His Majesty the Sultan of Morocco:

And whereas in pursuance of Article 121 of the said General Act, the ratifications of the said General Act and Additional Protocol of

all the signatory powers were deposited with the Government of His Majesty, the King of Spain, on December 31, 1906, thereby constituting a valid exchange of the ratifications thereof;

Now, therefore, be it known that I, Theodore Roosevelt, President of the United States of America, have caused the said General Act and Additional Protocol to be made public to the end that the same and every article and clause thereof may be observed and fulfilled with good faith by the United States and the citizens thereof, subject to the reservation made in the aforesaid Declaration of the Plenipotentiaries of the United States and to the Resolution of the Senate.     Proclamation.

In witness whereof, I have hereunto set my hand and caused the seal of the United States of America to be hereunto affixed.

Done at the City of Washington this twenty-second day of January, in the year of our Lord one thousand nine hundred and [SEAL] seven, and of the Independence of the United States of America the one hundred and thirty-first.

THEODORE ROOSEVELT

By the President:
    ELIHU ROOT
        *Secretary of State.*



**(no subject)**
1 message

darnel powell <darnelcpowell@gmail.com>
To: darnel powell <darnelcpowell@gmail.com>

Wed, Jan 26, 2022 at 12:28 PM



The Barbary Treaties 1786-1816
Morocco - Treaty of Peace; September 16, 1836

Barbary Treaties Menu

| Art 1 | Art 2 | Art 3 | Art 4 | Art 5 | Art 6 | Art 7 | Art 8 | Art 9 | Art 10 |
| Art 11 | Art 12 | Art 13 | Art 14 | Art 15 | Art 16 | Art 17 | Art 18 | Art 19 | Art 20 |
| Art 21 | Art 22 | Art 23 | Art 24 | Art 25 | | | | | |

*Treaty of Peace, signed at Meccanez (Meknes or Meqqbinez) September 16, 1836 (3 Jumada II, A.H. :1252). Original in Arabic.*

A document including a copy of the treaty in Arabic and an English translation, followed by a clause of conclusion under the seal of the United States consulate at Tangier, was signed by James R. Leib, consul and agent of the United States, on October 1, 1836.

Submitted to the Senate December 26, 1836. (Message of December 20, 1836.) Resolution of advice and consent January 17, 1837. Ratified by the United States January 28, 1837. As to the rati~cation generally, see the notes. Proclaimed January So, 1837.

The following twenty-six pages of Arabic text are a reproduction of the pages of the original treaty; but they are arranged in left-to-right order of pagination.(1) Then, from the above-mentioned document signed by James R. Leib on October 1, 1836, is printed the English translation, with the clause of conclusion reserving the treaty for the ratification of the President by and with the advice and consent of the Senate.

[Translation]

In the name of God, the merciful and Clement!

(Abd Errahman Ibenu Kesham whom God exalt!)

Praise be to God!

This is the copy of the Treaty of peace which we have made with the Americans; and written in this book; affixing thereto our blessed Seal, that, with the help of God, it may remain firm for ever.

Written at Meccanez, the City of Olives, on the 30 day of the month Jumad el lahhar, in the year of the Hegira 1252. (corresponding to Sept. 16. A.D. 1836.)

ART. 1.

We declare that both Parties have agreed that this Treaty, consisting of Twenty five Articles, shall be inserted in this Book, and delivered to James R. Leib, Agent of the United States, and now their Resident Consul at Tangier, with whose approbation it has been made, and who is

duly authorized on their part, to treat with us, concerning all the matters contained therein.

ART. 2.

If either of the parties shall be at war with any nation whatever, the other shall not take a commission from the enemy, nor fight under their colors.

ART. 3.

If either of the parties shall be at war with any nation whatever, and take a prize belonging to that nation, and there shall be found on board subjects or effects belonging to either of the parties, the subjects shall be set at Liberty, and the effects returned to the owners. And if any goods, belonging to any nation, with whom either of the parties shall be at war, shall be loaded on vessels belonging to the other party, they shall pass free and unmolested, without any attempt being made to take or detain them.

ART. 4.

A signal, or pass, shall be given to all vessels belonging to both parties, by which they are to be known when they meet at sea: and if the Commander of a ship of war of either party shall have other ships under his convoy, the declaration of the Commander shall alone be sufficient to exempt any of them from examination.

ART. 5.

If either of the parties shall be at war, and shall meet a vessel at sea belonging to the other, it is agreed, that if an

examination is to be made, it shall be done by sending a boat with two or three men only: and if any gun shall be fired, and injury done, without reason, the offending party shall make good all damages.

ART. 6.

If any Moor shall bring citizens of the United States, or their effects, to his Majesty, the citizens shall immediately be set at liberty, and the effects restored: and, in like manner, if any Moor, not a subject of these dominions, shall make prize of any of the citizens of America or their effects, and bring them into any of the ports of his Majesty, they shall be immediately released, as they will then be considered as under his Majesty's protection.

ART. 7

If any vessel of either party, shall put into a port of the other, and have occasion for provisions or other suplies, they shall be furnished without any interruption or molestation.

ART. 8.

If any vessel of the United States, shall meet with a disaster at sea, and put into one of our ports to repair, she shall be at Liberty to land and reload her cargo, without paying any duty whatever.

ART. 9.

If any vessel of the United States, shall be cast on shore on any part of our coasts, she shall remain at the disposition of the owners, and no one shall attempt going

near her without their approbation, as she is then considered particularly under our protection; and if any vessel of the United States shall be forced to put into our ports by stress of weather, or otherwise, she shall not be compelled to land her cargo, but shall remain in tranquility until the commander shall think proper to proceed on his voyage.

**ART. 10.**

If any vessel of either of the parties shall have an engagement with a vessel belonging to any of the Christian powers, within gun-shot of the forts of the other, the vessel so engaged, shall be defended and protected as much as possible, until she is in safety: and if any American vessel shall be cast on shore, on the coast of Wadnoon, or any coast thereabout, the people belonging to her, shall be protected and assisted, until by the help of God, they shall be sent to their country.

**ART. 11.**

If we shall be at war with any Christian power, and any of our vessels sails from the ports of the United States, no vessel belonging to the enemy shall follow, until twenty-four hours after the departure of our vessels: and the same regulation shall be observed towards the American vessels sailing from our ports, be their enemies Moors or Christians.

**ART. 12.**

If any ship of war belonging to the United States, shall put into any of our ports, she shall not be examined on

any presence whatever, even though she should have fugitive slaves on board, nor shall the governor or commander of the place compel them to be brought on shore on any pretext, nor require any payment for them.

**ART. 13.**

If a ship of war of either party shall put into a port of the other, and salute, it shall be returned from the fort with an equal number of guns, not more or less.

**ART. 14.**

The commerce with the United States, shall be on the same footing as is the commerce with Spain, or as that with the most favored nation for the time being; and their citizens shall be respected and esteemed, and have full liberty to pass and repass our country and sea-ports whenever they please, without interruption.

**ART. 15.**

Merchants of both countries shall employ only such interpreters, and such other persons to assist them in their business, as they shall think proper. No commander of a vessel shall transport his cargo on board another vessel: he shall not be detained in port longer than he may think proper; and all persons employed in loading or unloading or in any other labor whatever, shall be paid at the customary rates, not more and not less.

**ART. 16.**

In case of a war between the parties, the prisoners are not to be made slaves, but to be exchanged one for

another. Captain for Captain, Officer for Officer, and one private man for another; and if there shall prove a deficiency, on either side, it shall be made up by the payment of one hundred Mexican dollars for each person wanting. And it is agreed, that all prisoners shall be exchanged in twelve months from the time of their being taken, and that this exchange may be effected by a merchant, or any other person, authorized by either of the parties.

ART. 17.

Merchants shall not be compelled to buy or sell any kind of goods but such as they shall think proper: and nary buy and sell all sorts of merchandise but such as are prohibited to the other Christian nations.

ART. 18.

All goods shall be weighed and examined before they are sent on board; and to avoid all detention of vessels, no examination shall afterwards be made, unless it shall first be proved that contraband goods have been sent on board; in which case, the persons who took the contraband goods on board, shall be punished according to the usage and custom of the country, and no other person whatever shall be injured, nor shall the ship or cargo incur any penalty or damage whatever.

ART. 19.

No vessel shall be detained in port on any presence whatever, nor be obliged to take on board any article without the consent of the Commander, who shall be at

full liberty to agree for the freight of any goods he takes on board.

**ART. 20.**

If any of the citizens of the United States, or any persons under their protection, shall have any dispute with each other, the Consul shall decide between the parties; and whenever the Consul shall require any aid, or assistance from our government, to enforce his decisions, it shall be immediately granted to him.

**ART. 21.**

If a citizen of the United States should kill or wound a Moor, or, on the contrary, if a Moor shall kill or wound a citizen of the United States, the law of the Country shall take place, and equal justice shall be rendered, the Consul assisting at the trial; and if any delinquent shall make his escape, the Consul shall not be answerable for him in any manner whatever.

**ART. 22.**

If an American citizen shall die in our country, and no will shall appear, the Consul shall take possession of his effects; and if there shall be no Consul, the effects shall be deposited in the hands of some person worthy of trust, until the party shall/appear who has a right to demand them; but if the heir to the person deceased be present, the property shall be delivered to him without interruption; and if a will shall appear the property shall descend agreeably to that will, as soon as the Consul shall declare the validity thereof.

intention to abandon it; in which case, its operations shall cease at the end of the twelve months.

CONSULATE OF THE UNITED STATES OF AMERICA.

For The Empire of Morocco.

TO ALL WHOM IT MAY CONCERN.

BE IT KNOWN.

Whereas the undersigned, James R. Leib, a Citizen of the United States of North America, and now their Resident Consul at Tangier, having been duly appointed Commissioner, by letters patent, under the signature of the President and Seal of the United States of North America, bearing date, at the City of Washington, the Fourth day of July A.D. 1835, for negotiating and concluding a Treaty of peace and friendship between the United States of North America and the Empire of Morocco; I, therefore, James R. Leib, Commissioner as aforesaid, do conclude the foregoing Treaty and every Article and clause therein contained; reserving the same, nevertheless, for the final ratification of the President of the United States of North America, by and with the advice and consent of the Senate.

In testimony whereof, I have hereunto affixed my signature, and the Seal of this Consulate, on the First day of October, in the year of our Lord One Thousand eight hundred and Thirty sin, and of the Independence of the United States the Sixty First.

# Treaty of Peace & Friendship
## 1787
# Between Morocco and The United States

To all persons to whom these presents shall come or be made known- Whereas the United States of America in Congress assembled by their Commission bearing date the twelfth day of May One Thousand, Seven-Hundred and Eighty-Four thought proper to constitute John Adams, Benjamin Franklin and Thomas Jefferson their Ministers Plenipotentiary, giving to them or a Majority of them full powers to confer, treat & negotiate with the Ambassador, Minister or Commissioner of His Majesty the Emperor of Morocco concerning a Treaty of Amity and Commerce, to make & receive propositions for such Treaty and to conclude and sign the same, transmitting to the United States in Congress assembled for their final Ratification.

And by one other commission bearing date the Eleventh day of March One-Thousand Seven-hundred & Eighty-five did further empower the said Ministers Plenipotentiary or a majority of them, by writing under the Hands and Seals to appoint such agent in the said business as they might think proper with Authority under the directions and instruction of the said Ministers to commence & prosecute the said Negotiations & Conferences for the said Treaty provided that the said Treaty should be signed by Ministers: And Whereas, We the said John Adams & Thomas Jefferson two of the said Ministers Plenipotentiary (the said Benjamin Franklin being absent) by writing under the Hand and Seal of the said John Adams at London, October fifth, One-Thousand Seven-hundred and Eighty-five, & of the said Thomas Jefferson at Paris October the Eleventh of the same Year, did appoint Thomas Barclay, Agent in the business aforesaid, giving him the Powers therein, which by the said second commission we were authorized go give, and the said Thomas Barclay in pursuance thereof, bath arranged Articles for a Treaty of Amity and Commerce between the United States of America and His Majesty the Emperor of Morocco & sealed with His Royal Seal, being translated into the language of said United States of America, together with the Attestations thereto annexed are in the following words, To Wit:

### In the Name of Almighty God.

This is a Treaty of Peace and Friendship established between us and the United States of America, which is confirmed, and which we have ordered to be written in the Book and sealed with our Royal Seal at our Court of Morocco in the Twenty-Fifth day of the blessed month of Sha-

BAN, IN THE YEAR One-Thousand Two-hundred, trusting in God it will remain permanent.

## ARTICLE 1

We declare that both Parties have agreed that this Treaty consisting of twenty five Articles shall be inserted in this Book and delivered to the Honorable Thomas Barclay, the Agent of the United States now at our Court, with whose Approbation it has been made and who is duly authorized on their part, to treat with us concerning all the matters contained therein.

## ARTICLE 2

If either of the parties shall be at war with any nation whatever, the other party shall not take a commission from the enemy nor fight under their colors.

## ARTICLE 3

If either of the parties shall be at war with any nation whatever and take a prize belonging to that nation, and there shall be found on board subjects or effects belonging to either of the parties, the subjects shall be set at liberty and the effect returned to the owners. And if any goods belonging to any nation, with whom either the parties shall be at war, shall be loaded on vessels belonging to the other party, they shall pass free and unmolested without any attempt being made to take or detain them.

## ARTICLE 4

A signal or pass shall be given to all vessels belonging to both parties, by which they are to be known when they meet at sea, and if the commander of a ship of war of either party shall have other ships under his convoy, the Declaration of the commander shall alone be sufficient to exempt any of them from examination.

## ARTICLE 5

If either of the parties shall be at war, and shall meet a vessel at sea, belonging to the other, it is agreed that if an examination is to be made, it shall be done by sending a boat with two or three men only, and if any gun shall be bread and injury done without reason, the offending party shall make good all damages.

## ARTICLE 6

If any **Moor** shall bring citizens of the United States or their effects to His Majesty, the citizens shall immediately be set at liberty and the effects restored, and in like manner, if any **Moor** not a subject of the dominions shall make prize of any of the citizens of America or their effects and bring them into any of the ports of His Majesty, they shall be immediately released, as they will be considered as under His Majesty's Protection.

## ARTICLE 7

If any vessel of either party shall put into a port of the other and have occasion for provisions or other supplies, they shall be furnished without any interruption or molestation.

## ARTICLE 8

If any vessel of the United States shall meet with a disaster at sea and put into one of our ports to repairs, she shall be at liberty to land and reload her cargo, without paying any duty whatever.

## ARTICLE 9

If any Vessel of the Untied States shall be cast on Shore on any Part of our Coasts, she shall remain at the disposition of the Owners and no one shall attempt going near her without their Approbation, as she is then considered particularly under our Protection; and if any Vessel of the United States shall be forced to put in to our Ports, by Stress of weather or otherwise, she shall not be compelled to land her Cargo, but shall remain in tranquility until the Commander shall think proper to proceed on his Voyage.

## ARTICLE 10

If any Vessel of either of the Parties shall have an engagement with a Vessel belonging to any of the Christian Powers within gunshot of the Forts of the other, the Vessel so engaged shall be defended and protected as much as possible until she is in safety; and if any American Vessel shall be cast on shore on the Coast of Wadnoon or any Coast thereabout, the People to her shall be protected, and assisted until by the help of God, they shall be sent to their Country.

## ARTICLE 11

If we shall be at War with any Christian Power and any of our Vessels sail from the Ports of the United States, no Vessel belonging to the enemy shall follow until twenty four hours after the Departure of our Vessels; and the same Regulation shall be observed towards the American Vessels sailing from our Ports— be the enemies **Moors** or Christians.

## ARTICLE 12

If any ship of war belonging to the United States shall put into any of our ports, she shall not be examined on any pretense whatever, even though she should have fugitive slaves on board, nor shall the governor or commander of the place compel them to be brought on shore on any pretext, nor require any payment for them.

## ARTICLE 13

If a ship of war of either party shall put into a port of the other and salute, it shall be returned from the fort with an equal number of guns, not with more or less.

## ARTICLE 14

The commerce with the United States shall be on the same footing as is the commerce with Spain, or as that with the most favored nation for the time being; and their citizens shall be respected and esteemed, and have full liberty to pass and repass our country and seaports whenever they please, without interruption.

## ARTICLE 15

Merchants of both countries shall employ only such interpreters, and such other persons to assist them in their business, as they shall think proper. No commander of a vessel shall transport his cargo on board another vessel; he shall not be detained in port longer than he may think proper; and all persons employed in loading or unloading goods, or in any labor whatever, shall be paid at the customary rates, not more and not less.

## ARTICLE 16

In case of a war between the parties, the prisoners are not to be made slaves, but to be exchanged one for another, captain for captain, officer for officer, and one private man for another; and if there shall prove a deficiency on either side, it shall be made up by the payment of one hundred Mexican dollars for each person wanting. And it is agreed that all prisoners shall be exchanged in twelve months from the time of their being taken, and that this exchange may be effected by a merchant or any other person authorized of by either of the parties.

## ARTICLE 17

Merchants shall not be compelled to buy or sell any kind of goods but such as they shall think proper; and may buy and sell all sorts of merchandize but such as are prohibited to the other Christian nations.

## ARTICLE 18

All goods shall be weighed and examined before they are sent on board , and to avoid all detention of vessels, no examination shall afterwards be made, unless it shall first be proved that contraband goods have been sent on board, in which case, the persons who took the contraband goods on board, shall be

## ADDITIONAL ARTICLE

Grace to the only God.

I, the under-written, the servant of God, Taher Ben Abdelkack Fennish, do certify, that His Imperial Majesty, my master, *(whom God preserve),* having concluded a treaty of peace and commerce with the United States of America, has ordered me, the better to complete, it, and in addition of the tenth article of the treaty, to declare, "That if any vessel belonging to the United States, shall be in any of the ports of his Majesty's dominions, or within gun-shot of his forts, she shall be protected as much as possible; and no vessel whatever, belonging either to Moorish or Christian Powers, with whom the United States may be at war, shall be permitted to follow or engage her, as we now deem the **citizens of America** our good friends."

And, in obedience to this Majesty's commands, I certify this declaration, by putting my hand and seal to it, on the eighteenth day of Ramadan, (a) in the year one thousand two hundred.
The servant of the King, my master, whom God preserve.

**TAHER BEN ABDELKACK FENNISH.**

I do certify that the above is a true copy of the translation made at Morocco, by Isaac Cordoza Nunez, interpreter, of a declaration made and signed by Sidi Hage Taher Fennish, in addition to the treaty between the Emperor of Morocco and the United States of America, which declaration the said Taher Fennish made by the express directions of his Majesty.

**THOMAS BARCLAY.**

## TREATY WITH MOROCCO. 1787

Now, KNOW YE, That we, the said John Adams and Thomas Jefferson, Ministers Plenipotentiary aforesaid, do approve and conclude the said treaty, and every article and clause therein contained, reserving the same nevertheless to the United States in Congress assembled, for their final ratification.
In testimony whereof, we have signed the same with our names and seals, at the places of our respective residence, and at the dates expressed under our signatures respectively.

**JOHN ADAMS,**     (L.S.)
*London, January 25th, 1787.*

**THOMAS JEFFERSON,**     (L.S.)
*Paris, January 1st, 1787.*

Jarnel Powell Bey
P.D. Box 308
Huntington Station, NY
11746





RETURN RECEIPT
REQUESTED

7020 1290 0000 0664 8627


U.S. POSTAGE PAID
ECM LG ENV
ELMONT, NY
11003
APR 18, 22
AMOUNT

**$9.56**
R2305K135112-10

United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York
11201

attn: Pro se' dept
Index #: